CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
September 29, 2025
LAURA A. AUSTIN, CLERK
BY: s/A. Beeson
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| CHRISTOPHER D. LUMPKIN, ) | |
|    Petitioner, ) | Civil Action No. 7:24-cv-00860 |
| ) | |
| v. ) | |
| ) | By: Elizabeth K. Dillon |
| CHADWICK DOTSON, ) | Chief United States District Judge |
|    Respondent. ) | |

**MEMORANDUM OPINION**

    The petitioner, Christopher D. Lumpkin, filed this 28 U.S.C. § 2254 action in the Eastern District of Virginia, and the matter was transferred here on December 6, 2024. (Dkt. No. 4.) Lumpkin's petition challenges his convictions and four life sentences in the Circuit Court for the City of Danville for forcible sodomy of a child under the age of thirteen, object sexual penetration of a child under the age of thirteen, and aggravated sexual battery of a child under the age of thirteen. Case Nos. CR20000741, 743, 745, 746, 747, 748 (Danville Cir. Ct.).

    Lumpkin brings six claims, four of which are ineffective assistance of counsel claims. *See Strickland v. Washington*, 466 U.S. 668 (1984). The respondent has filed a motion to dismiss. (Dkt. No. 19.) Lumpkin responded (Dkt. Nos. 24, 25) and filed two motions: a motion for a new trial, and a motion for a urologist. (Dkt. Nos. 26, 27.) Lumpkin has also filed additional exhibits which the court has reviewed. (Dkt. Nos. 29, 31, 32, 33, 34.) The court finds that Lumpkin's ineffective assistance of counsel claims are procedurally defaulted, and the remaining claims fail on their merits under the deferential standard for federal habeas review. Accordingly, respondent's motion will be granted, Lumpkin's motions will be denied, and the court will issue an order dismissing this action.

## I. BACKGROUND

### A. State Court Proceedings

Lumpkin was convicted after a two-day trial and sentenced to four life sentences plus forty years with all but one hundred and twenty years suspended. (Resp't Ex. A.) Lumpkin appealed to the Court of Appeals of Virginia. The court affirmed Lumpkin's convictions in an unpublished opinion. *Lumpkin v. Commonwealth*, Record No. 0129-22-3, 2023 WL 4565877 (Va. Ct. App. July 18, 2023). The Supreme Court of Virginia refused his petition for appeal and petition for a rehearing. (Resp't's Ex. D, E.)

Lumpkin filed a *pro se* petition for a writ of habeas corpus in the Danville Circuit Court. He alleged the following:

> (1) Denial of due process and effective assistance of counsel because counsel did not provide good representation;
>
> (2) Counsel did not allow him to tell his side of the story to the court. He did not introduce into evidence interviews where the girl lied three different times in her statements;
>
> (3) Counsel failed to ask any witnesses about Lumpkin's brain injuries, disabilities, mental issues, or dyslexia.

(Resp't's Ex. F.) Lumpkin's petition was denied without an evidentiary hearing. (Resp't's Ex. G.) Lumpkin appealed, and the Court of Appeals informed Lumpkin that he failed to include the filing fee or evidence that he was exempt from the payment, enclosing an *in forma pauperis* affidavit for him to return. (Ex. H, 10/21/24 Letter to Christopher Lumpkin.) The Court of Appeals dismissed the appeal because the filing fee was not timely received. (Resp't's Ex. I.)

Lumpkin filed a second *pro se* petition for a writ of habeas corpus in the Supreme Court of Virginia. The petition had similar, but not identical, claims as his first petition. (Resp't's Ex.

J.)[1]  The Supreme Court of Virginia dismissed the petition on February 14, 2023, because his claim was not previously raised, the facts of which were known prior to his first petition, and his first petition did not solely raise a claim for a belated appeal. (Resp't's Ex. K (citing Va. Code § 8.01-654(B)(2).)

**B. Lumpkin's Claims**

Lumpkin raises the following claims now in federal court:

(1) James Martin would not remove a juror that I asked to be moved off the jury. The juror in question tried to get himself removed because one of his family members had been raped in the past. He was not removed and his personal feeling may have influenced the jury and caused my conviction.

(2) James Martin came to the jail and told me that he knew I was guilty for fucking everybody else and that I needed to plead guilty because I was a piece of shit and that I was going to prison no matter what happens. Then he came back and apologized for what he said which is another reason I got found guilty because he didn't do his job.

(3) James Martin also knew that they found Hispanic D.N.A. and I'm Caucasian and he hid it from the court and the jurors.

(4) James Martin also did not question my witnesses about things they knew about this case like: one of my witnesses was sixteen and around me all of her life. Her names was Montana McCoy. She would have been a great witness if Mr. Martin had done his job. She could have shown the jury and the courts that I did not do this crime.

---

[1] Lumpkin alleged the following claims:

(1) Petitioner was denied due process and effective assistance of counsel because counsel did not provide good representation;

(2) My counsel would not let me tell my whole side of the case and he did not introduce the facts in the case. Attorney James Martin came to the jail before the trial and cursed me out and said he knew that I committed the crime and other things. He should have been removed from my case. The girl lied more than one time and I have a 32-page report from the Virginia Department of Social Services that shows I did not do the crime. The report says "not founded" and that it was lies told against me and got me sent to prison. I am 100% innocent.

(3) Attorney James Martin failed to provide good representation at my trial and failed to ask my witnesses about anything to do with the case. He lied to me and failed to say anything about my brain injuries or anything about my disability, mental issues, or anything that could help my case and that show I am 100% innocent.

> Mr. Martin refused to ask the questions I requested him to ask of the witnesses.
>
> (5) A violation of the Eighth Amendment, violation of Due Process and a violation of fair sentencing.
>
> (6) Mr. Lumpkin asked the court to see a urologist because it will show Mr. Lumpkin did not commit this crime because of the injuries that he has in his private area and the court denied his right to see a doctor to prove his innocence.

(Habeas Pet. 4–5.)

## C. Findings of Fact by the Court of Appeals of Virginia[2]

> In June 2019, H.A. and her mother, Christie Lee, lived with Lumpkin, Lee's fiancé. On June 24, 2019, H.A. and Lumpkin drove Lee to work and then went to a pond to fish. After several hours, H.A. and Lumpkin returned home. Both H.A., then eleven years old, and Lumpkin showered and then watched a movie in Lumpkin's bed. During that time, Lee called Lumpkin's phone, but he did not answer.
>
> While watching the movie Lumpkin "started rubbing on [H.A.'s] butt" and "told [her] to take [her] clothes off." H.A. complied because she was scared Lumpkin would hurt her. Lumpkin removed his clothes and inserted his fingers into H.A.'s vagina, moving them up and down. Lumpkin told H.A. "[t]o suck his dick," and H.A. put his penis in her mouth. H.A. stated that the sexual activity ceased because Lumpkin had to pick up her mother. H.A. put on the same clean pair of underwear she had on before Lumpkin told her to undress.
>
> Upon returning home, Lumpkin and Lee argued. After Lumpkin walked outside to check on his garden, H.A. approached Lee and stated that Lumpkin "was forcing [her] to have sex with him." H.A. and her mother immediately fled to a neighbor's home where they called 911.
>
> Danville Police Corporal Wood and Sergeant Shively investigated H.A.'s report of sexual assault. Corporal Wood took Lumpkin to the

---

[2] These factual findings were made by the Court of Appeals of Virginia when it affirmed Lumpkin's convictions. *See Lumpkin*, 2023 WL 4565877, at *1–4. These facts are entitled to deference in federal court. *See* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

police station for questioning and then returned with a house key to allow H.A. and her mother to collect some belongings. Corporal Wood stated he did not remember H.A. changing clothes.

Danville Detectives Bailey and High arrived at Lumpkin's home while H.A. and Lee gathered their belongings. Detective Bailey drove H.A. and Lee to an emergency room in Lynchburg. Meanwhile, Detective High interviewed Lumpkin about the allegations. Lumpkin agreed to provide a buccal swab, swabs of his hands, and scrapings of his fingernails for testing.

H.A. arrived at the emergency room at 1:00 a.m. Sexual Assault Nurse Examiner (SANE) Donna Cling interviewed H.A. before collecting physical evidence. When Cling asked H.A. if anyone had hurt her, H.A. stated "it was Chris." Cling asked what Lumpkin had done, and H.A. stated that "he forced me to have sex with him." According to H.A., Lumpkin put his mouth on her genital region, her mouth, and her breasts. He had pushed her head down and made her perform fellatio and had rubbed his penis on her genitals. When asked if she had ever seen anything come out of Lumpkin's penis, she responded "white fizzy stuff." H.A. explained that she knew the "white fizzy stuff" was sperm because Lumpkin had told her it was.

H.A. told Cling that the sexual abuse had started around the beginning of the year and occurred one to three times a month. H.A. noted that she experienced pain while urinating after these encounters. H.A. indicated that she had not urinated, defecated, bathed, or douched since the June 24 incident.

Cling collected H.A.'s clothing and swabs and placed the evidence into the physical exam recovery kit (PERK) for testing. Forensic scientist Kathleen Holtsnoggle conducted DNA analyses of the samples in the PERK and those taken from Lumpkin. The DNA mixture profile from the lip area sample was attributed to H.A. and one additional contributor, which had no value. A DNA mixture profile from the anorectal sample was attributed to H.A. and one additional contributor, which also had no value. No male DNA was detected in the breast, perianal, or buttocks samples. Further, a DNA analysis of swabs taken from Lumpkin's mouth and hands indicated that there was another contributor, but that DNA type was not suitable for comparison. H.A.'s PERK was sent for further testing at the central lab.

Forensic scientist Brian Covington also conducted a Y-chromosome DNA analysis (YSTR) for this case. Covington explained that YSTR analysis "targets different areas of the DNA, specifically the

Y-chromosome DNA, which is specific to males." Covington was able to develop a Y-chromosome DNA profile from H.A.'s anorectal sample. Lumpkin could not be eliminated as a major contributor to the male DNA mixture profile.

Forensic scientist Catherine Columbo tested the yellow stain in the groin area of H.A.'s underwear. Seminal fluid and spermatozoa cells were identified in the yellow stain on H.A.'s underwear. Finally, a DNA mixture profile from the lip area sample was attributed to H.A., and Lumpkin could not be eliminated as a contributor.

On July 23, 2019, Piedmont Access to Health Services (PATHS) counselor Jessica Hayes conducted an initial assessment with H.A., Lee, and Lumpkin. Lumpkin explained what the allegations were to Hayes. Lumpkin's presence at the assessment concerned Hayes. At a follow-up interview on August 8, 2019, Lumpkin did not appear, and Hayes talked with H.A. individually.

H.A. told Hayes that Lumpkin "made me suck his thing" and that "stuff came out twice." When asked if she felt safe living in the same home as Lumpkin, H.A. stated she "[felt] safe. I never am with him alone anymore." H.A. indicated that Lumpkin told her he would buy her a new phone if she lied about the abuse. During successive interviews with H.A. on August 15 and 28, Hayes noticed H.A. was pulling out her hair. Hayes stated that the compulsion to pull hair is a sign of childhood trauma.

On August 16, 2019, Carlos Cottie and April Duckworth of Child Protective Services interviewed H.A. H.A. stated that after returning from the pond she showered and began watching a movie with Lumpkin in his bed. He told her to undress, undressed himself, and then inserted his finger inside her genitals. She stated that this type of sexual contact had begun in January and sometimes occurred at Lumpkin's mother's home. H.A. stated that Lumpkin's penis did not go near her genitalia but that he had masturbated and ejaculated in front of her. H.A. indicated that Lumpkin had never kissed her on the face but that he sometimes licked her genitals and had done so on about five occasions before June 24.

In an August 20, 2019, recorded interview conducted by Danville Police Corporal Jacob Amos, H.A. recounted the June 24 events. She reiterated that after she and Lumpkin took Lee to her work, they went to a pond. After a few hours, they left the pond, returned home, and each took a shower. While H.A. was showering, Lumpkin looked for a movie to watch. They began to watch the movie on his bed. Then Lumpkin began to rub H.A.'s "butt." He told her to take

off all her clothes and to "get to where he was at." He then "made [her] suck his thing" which H.A. stated was soft. Lumpkin also inserted his fingers in her "girl part." The sexual activity ceased because Lumpkin had to pick up Lee.

On direct examination, H.A. testified that Lumpkin's sexual advances had begun in early 2019. The first time Lumpkin initiated sexual activity with her was at his mother's home. Lumpkin told H.A. to undress, which she did. Lumpkin also disrobed and inserted his finger into H.A.'s vagina. He then made H.A. perform fellatio on him.

Over the next six months Lumpkin engaged in sexual activity with H.A. one to three times a month. He showered with her and masturbated in front of her. Once while preforming fellatio on Lumpkin, he ejaculated, and Lumpkin explained to H.A. that sperm was the "white stuff that comes out" of his penis. On cross-examination H.A. admitted that her reports of the incident differed slightly each time she reiterated them because she tried to put the sexual abuse out of her mind.

The Commonwealth moved to introduce, and the trial court admitted, a redacted transcript of the April 20, 2021 hearing during which Lumpkin testified about his erectile dysfunction.

Lumpkin testified in his defense and admitted that he was a convicted felon. He stated that in 2019, he and Lee were engaged and lived together in his home with H.A. He acknowledged fishing with H.A. on June 24, 2019, and explained that after they returned home, he showered. As H.A. prepared to shower, he asked to use the bathroom, and moved her clothing off the toilet. He suggested his DNA could have attached to her clothing from this touching. Lumpkin indicated that Lee and H.A. moved out of the house on June 24 but returned in August 2019. Lumpkin stated he demanded they leave in September 2019 because he and Lee continued to argue and "[j]ust couldn't get along." Lumpkin denied any sexually inappropriate behavior with H.A.

At sentencing, Lumpkin appeared by video "because of COVID issues." Lumpkin objected to appearing remotely, and the trial court overruled the objection. Lumpkin's counsel noted Lumpkin's exception to the court's ruling stating "that's a violation of the confrontation clause" and Lumpkin's due process rights.

The trial court sentenced Lumpkin to life imprisonment with all but twenty-five years suspended for each count of forcible sodomy with

>a child under the age of thirteen and object sexual penetration with a child under the age of thirteen. For each count of aggravated sexual battery with a child under the age of thirteen, the court sentenced Lumpkin to twenty years, with ten years suspended. Lumpkin's active incarceration totaled 120 years. In departing from the guidelines, the trial court explained "this defendant sexually abused a young child who lived in his home with her mother and is not deserving of any consideration. He continued to write the victim and her family despite repeated court admonitions to stop. He does not ever need to be released."

(Resp't's Ex. C.)

### D. Respondent's Motion to Dismiss

Respondent argues that claims one through four of Lumpkin's petition are procedurally defaulted. (Br. in Supp. of Mot. to Dismiss 9–10, Dkt. No. 21.) Lumpkin cannot establish cause, prejudice, or actual innocence to evade the procedural bar. Also, Lumpkin's ineffective assistance of counsel claims are not "substantial" pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). Further, claims five and six cannot withstand deferential review under AEDPA. (*See id.*)

### E. Lumpkin's Responses and Motions

In one of Lumpkin's responses to the motion to dismiss, the brief makes several assertions of ineffective assistance of counsel that are different and distinct from those raised in Lumpkin's petition. (Dkt. No. 24.) In another response, Lumpkin references his request for a urologist because it would have shown at trial that he could not have sexually assaulted anyone. (Dkt. No. 25.) Lumpkin has also filed a motion for a new trial with no supporting arguments. (Dkt. No. 26.) None of these three filings were signed by Lumpkin. Lumpkin has also moved for this court to appoint a urologist which would demonstrate that he is "totally impotent" due to a 2004 injury. (Dkt. No. 27.)

II.  ANALYSIS

## A. Procedural Default

### 1. Exhaustion and procedural default

A state prisoner must exhaust his remedies in state court before seeking habeas corpus relief in federal court.  28 U.S.C. § 2254(b).  A federal court "may not grant a writ of habeas corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest state court."  *Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000).  Further, the petitioner must present to the state court the same operative facts and the same controlling legal principles that he seeks to present to the federal court.  *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995); *Kasi v. Angelone*, 300 F.3d 487, 501–02 (4th Cir. 2002).  Failure to do so "deprive[s] the state court of an opportunity to address those claims in the first instance."  *Coleman v. Thompson*, 501 U.S. 722, 732 (1991).  A petitioner must also present his federal claims to the appropriate state court in the manner required by the state court, so as to give the state court "a meaningful opportunity to consider allegations of legal error."  *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986).  A state prisoner does not "fairly present" a claim for exhaustion purposes when the claim is raised in "a procedural context in which its merits will not be considered."  *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

"A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court."  *Baker*, 220 F.3d at 288; *see Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998) (describing the procedural default doctrine as a "distinct but related limit on the scope of federal habeas review").  Simultaneous exhaustion and procedural default occurs "when a habeas petitioner fails to exhaust available state remedies and

9

'the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Breard*, 134 F.3d at 619 (quoting *Coleman*, 501 U.S. at 722). In that case, "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Baker*, 220 F.3d at 288.

Respondent argues that claims one through four in Lumpkin's petition are procedurally defaulted. These claims are variations of ineffective assistance of counsel claims. None of them were addressed on the merits in state court. At this point, they are simultaneously exhausted and procedurally defaulted because they would be barred from review in the courts of Virginia. *See* Va. Code § 8.01-654(B)(2) ("No writ shall be granted on the basis of any allegation the facts of which petitioner had knowledge at the time of filing any previous petition."); *Pope v. Netherland*, 113 F.3d 1364, 1372 (4th Cir. 1997) (stating that Va. Code § 8.01-654(B)(2) is an independent and adequate state law default).

For these reasons, Lumpkin's ineffective assistance claims are procedurally defaulted.

**2.  *Martinez* exception**

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court recognized a narrow exception for defaulted claims of ineffective assistance of trial counsel in a state, such as Virginia, where a prisoner is not allowed to raise an ineffective assistance claim on direct appeal. A "prisoner may establish cause for a default of an ineffective-assistance [of trial counsel] claim . . . where the state courts did not appoint counsel in the initial-review collateral proceedings . . . [or] where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*." *Martinez*,

10

566 U.S. at 14.  Respondent does not dispute that one of these requirements is present for Lumpkin.

However, to overcome the default a prisoner must also "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the claim has some merit." *Id.*  "To invoke *Martinez*, [a petitioner] must demonstrate that [his] underlying ineffective assistance of counsel claim is substantial with reference to *Strickland*'s two familiar prongs." *Sigmon v. Stirling*, 956 F.3d 183, 199 (4th Cir. 2020).  A substantial claim is one that has "some merit, a standard that the *Martinez* Court likened to the one that governs the issuance of [certificates of appealability] under 28 U.S.C. § 2253(c)(2)." *Owens v. Stirling*, 967 F.3d 396, 423 (4th Cir. 2020).

Under *Strickland*, a petitioner must "show . . . that counsel's performance was constitutionally deficient." *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021) (citing *Strickland*, 466 U.S. at 687).  Second, even if a petitioner establishes that his counsel's assistance was constitutionally deficient, the petitioner must "establish prejudice, in the form of a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Mayhew*, 995 F.3d at 176 (quoting *Strickland*, 466 U.S. at 694).

Lumpkin asserts that his counsel was ineffective for not pursuing the removal of a juror, telling Lumpkin that he knew Lumpkin was guilty, concealing evidence that investigators found Hispanic D.N.A. evidence, and refusing to call a witness that was "sixteen and around me all of her life." (Habeas Pet. 5.)  These are not substantial ineffective assistance claims.[3]

---

[3] One of the briefs that was filed in opposition to the motion to dismiss makes several assertions of ineffective assistance of counsel that are different and distinct from those raised in Lumpkin's petition. (Dkt. No. 24.)  The court does not consider these claims to be properly raised.  Moreover, this brief was not signed, which is a violation of Rule 11 of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 11(a).

11

When reviewing the propriety of any alleged acts or omissions, courts give substantial deference to defense counsel's strategic judgments. *Strickland*, 466 U.S. at 689–90. The attorney's decision to call or not call witnesses or to conduct voir dire in a certain manner fall into this category.[4] Moreover, Lumpkin's complaint that his attorney yelled at him and stated that Lumpkin was guilty cannot state the basis for an ineffective assistance claim. *See, e.g.*, *United States v. Mutuc*, 349 F.3d 930, 934 (7th Cir. 2003) ("The Sixth Amendment does not guarantee a friendly and happy attorney-client relationship."); *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984) (stating that the ineffective assistance of counsel inquiry "focuses on the adversarial process, not on the accused's relationship with his lawyer as such . . ."). Further, there was overwhelming evidence pointing to Lumpkin's guilt, which means that Lumpkin cannot establish prejudice. *See, e.g.*, *Lewis v. Dotson*, No. 7:22cv00421, 2024 WL 1419757, at *7 (W.D. Va. Apr. 2, 2024) (finding ineffective assistance claim based on failure to strike juror was not substantial under *Martinez* because it "was only one juror of twelve, and the evidence in the case was overwhelming"). The young victim had only "minor inconsistencies" in her testimony, but consistently identified Lumpkin as the person who molested her. (*See* Affidavit of Petra Haskins, Chief Deputy Commonwealth's Attorney for the City of Danville ¶ 7, Ex. R, Dkt. No. 21-18; Ex. O at 42–46, 49–50, 105–06.) Also, the DNA evidence was "compelling." (Haskins Aff. ¶ 8 (explaining that "Male DNA was found in the anorectal samples taken from the victim" and the "defendant's DNA was found in stains found in her underpants"); Martin Aff ¶ 6 ("Nevertheless, the evidence against Lumpkin, particularly the DNA evidence, was

---

[4] Respondent provided an affidavit by counsel explaining his reasoning for not striking the juror. (*See* Martin Aff. ¶ 5, Ex. Q, Dkt. No. 21-17 (stating that the juror was "from an address that is in a relatively high crime area, so it is possible that I thought he might somehow be less hostile to a person merely because he had been charged with a crime").)

12

overwhelming—and got even worse when he insisted that the lab do further testing, which immeasurably strengthened the Commonwealth's case.").)

Accordingly, Lumpkin cannot overcome his procedural default pursuant to *Martinez*. His ineffective assistance of counsel claims will be dismissed.[5]

**B. Merits Standard of Review**

A federal petition for a writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute sets forth a highly deferential standard for evaluating state court rulings, under which state court decisions are to "be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005). A federal court may not grant a writ of habeas corpus unless the state court's adjudication on the merits (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). A state court adjudication is contrary to clearly established federal law under § 2254(d) when the state court (1) "arrives at a conclusion opposite to that reach by [the Supreme] Court on a question of law"; or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the

---

[5] Because Lumpkin's claims are not substantial under *Martinez*, the court finds it unnecessary to address the other avenues to address defaulted claims, such as cause and prejudice, or the miscarriage of justice exception. *See, e.g.*, *Lewis*, 2024 WL 1419757, at *5 (bypassing the cause and prejudice analysis for ineffective assistance claims because "a different test governs those claims").

13

Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

A federal habeas court "may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams*, 529 U.S. at 411). The state court's application of federal law must be "objectively unreasonable." *Id.* Furthermore, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). The fact that "reasonable minds reviewing the record might disagree about the finding in question" is not enough to deem a state court's factual determination unreasonable. *Id.*

In conducting this review, the court applies the "look through" doctrine to the last reasoned decision addressing the claim, which is the opinion of the Court of Appeals of Virginia (Ex. C, Dkt. No. 21-3). *See Wilson v. Sellers*, 584 U.S. 122, 129 (2018) (federal habeas court should presume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground").

### 1. Challenge to sentence

Lumpkin challenges his sentence by asserting that it violated the Eighth Amendment, due process, and "fair sentencing". (Habeas Pet. 5.) The Court of Appeals rejected this argument by reasoning that Lumpkin was sentenced within the statutory ranges for each of his six convictions, and the only reason the total sentence exceeds his life expectancy is because "he committed so many separate crimes." (Ex. C at 14.) The court also refused to conduct a proportionality

14

review or extend the analysis in *Miller v. Alabama*, 567 U.S. 460 (2012) for juveniles sentenced to life incarceration without parole to include adults.  "The Supreme Court of the United States has never found a non-life sentence for a term of years within the limits authorized by statute to be, by itself, a cruel and unusual punishment in violation of the Eighth Amendment."  (Ex. C at 13 (quoting *Hutto v. Davis*, 454 U.S. 370, 372 (1982)).

This reasoning is not contrary to, or an unreasonable application of, clearly established federal law.  Similar to the reasoning employed by the Court of Appeals of Virginia, the Fourth Circuit has held that "proportionality review" under the Eighth Amendment's cruel and unusual punishment clause "is not available for any sentence less than life imprisonment without the possibility of parole."  *United States v. Malloy*, 568 F.3d 166, 180 (4th Cir. 2009).  Lumpkin's convictions do not preclude the possibility of geriatric parole.  *See* Va. Code § 53.1-40.01 (permitting conditional release for certain geriatric prisoners).

Respondent's motion to dismiss will be granted as to this claim.

### 2. Request to see a urologist

Lumpkin argues that the trial court erred by not granting his motion to see urologist.  Lumpkin argues that this would have demonstrated that he did not commit these crimes because of "injuries that he has in his private area."  (Habeas Pet. 5.)  The Court of Appeals rejected this argument, applying the standard set forth in *Husske v. Commonwealth*, 476 S.E.2d 920 (Va. 1996).  Under *Husske*, state funds are not available for an expert witness unless a defendant is able to "show a 'particularized need' for the expert testimony."  *Yarbrough v. Johnson*, 520 F.3d 329, 337 (4th Cir. 2008) (citing *Husske*, 476 S.E.2d at 925).  The Court found that the trial court "did not abuse its discretion in concluding that Lumpkin failed to present a particularized need for an expert."  (Ex. C at 8.)

15

> Lumpkin had no documentation of his impotency, a problem he claimed existed since 2004. Nor did he assert that the condition, once diagnosed, would have persisted to the date of the offenses and beyond. Additionally, he was unable to otherwise identify the diagnosing physician and had failed to mention the condition to any subsequent physicians for eighteen years. We also note that the crimes for which he was convicted occurred roughly two years before the request to appoint a urologist was made. Any finding that Lumpkin was impotent at the time of testing would therefore not necessarily prove that he was impotent at the time the crimes occurred. Although Lumpkin hoped that expert assistance would develop mitigating evidence that would lead to acquittal, 'a mere hope or suspicion that favorable evidence may result from an expert's services does not create a constitutional mandate.' *Hoverter v. Commonwealth*, 23 Va. App. 454, 467 (1996). Accordingly, we will not reverse the trial court's decision.

(Ex. C at 8–9.)

The Fourth Circuit has held that the "particularized need" standard in *Husske* is "congruent with the requirements of the federal Constitution." *Morva v. Zook*, 821 F.3d 517, 525 (4th Cir. 2016) (citing *Ake v. Oklahoma*, 570 U.S. 68, 74 (1985)). The application of this rule by the Court of Appeals of Virginia is not contrary to or an unreasonable application of clearly established federal law. Its reasoning demonstrates that Lumpkin provided no more than speculation that retaining a urologist as an expert would result in favorable evidence. Neither does Lumpkin overcome the presumption of correctness afforded to the state court's findings of fact, such that he could demonstrate that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. §§ 2254(d), 2254(e)(1).

The court will grant the respondent's motion to dismiss this claim.

16

### C. Lumpkin's Motions

Lumpkin, as noted, has filed a motion for a urologist. This motion will be denied for the reasons stated in this opinion. Lumpkin has also not provided any justification for a new trial, as he is not entitled to habeas relief in federal court.

### D. Certificate of Appealability

The court must also consider whether to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2); Rule 11, Rules Governing Section 2254 Cases. Petitioner has failed to make a substantial showing of the deprivation of a constitutional right, 28 U.S.C. § 2253(c)(2), or that the court's procedural rulings are debatable among reasonable jurists, *see Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, the court declines to issue a certificate of appealability.

## III. CONCLUSION

For the reasons stated in this opinion, the court will issue an appropriate order granting the respondent's motion to dismiss, denying Lumpkin's motions, and declining to issue a certificate of appealability.

Entered: September 29, 2025.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
Chief United States District Judge